**PRECISION STEEL DECKING & ERECTION COMPANY, Inc.**

v.

**AMERICAN STEEL BUILDING COMPANY, Inc.**

and

**Reliance Insurance Company.**

**Civ. A. No. 69–2144.**

United States District Court,
E. D. Pennsylvania.

Aug. 3, 1972.

**432**

Samuel Moonblatt, Philadelphia, Pa., for plaintiff.

Edwin B. Barnett, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

MASTERSON, District Judge.

This complaint and counterclaim involve a dispute arising out of the written contract between Precision Steel Decking & Erection Company, Inc. and American Steel Building Company, Inc. The case has been submitted to us for decision upon a comprehensive set of agreed stipulated facts and upon the depositions of several key witnesses. After thoroughly considering this record and counsels' briefs and oral argument we make the following:

## FINDINGS OF FACT

1. Plaintiff, Precision Steel Decking & Erection Company, Inc. (herein called "Precision"), is a New Jersey corpora-tion, having at the time this action commenced its principal place of business in Westville, New Jersey.

2. At such time Precision was engaged in the erection of steel buildings and other structures.

3. Defendant, American Steel Building Company, Inc. (herein called "American"), is a Texas corporation having its principal office in Houston, Texas.

4. American is engaged, inter alia, in the fabrication, sale and erection of metal structures.

5. Defendant, Reliance Insurance Company, is a Pennsylvania corporation, having its principal office in Philadelphia, Pennsylvania.

6. Berkeley Construction Company (herein called "Berkeley"), on or about April 29, 1968 entered into a contract with the City of Philadelphia to complete general construction of a service hangar and three "T" hangars at the North Philadelphia Airport, for a price of $513,000.00.

7. On or about August 20, 1968 Berkeley entered into a subcontract with American whereby American was to furnish all labor and material for the erection of said hangars, for a price of $284,000.00.

8. Approximately three months later, American entered into a written contract, dated November 7, 1968, wherein Precision was to furnish "all labor and equipment" to erect the four hangars. Said "sub-subcontract" was in the amount of $72,900.00; American was to "advance funds weekly" to cover Precision's "payroll, crane rental and other charges." The work was to commence on or about November 8, 1968 and be completed within "10 to 12 weeks." Exhibits D–17 and D–17a are copies of American's records relating to its contract with Berkeley and Precision.

9. The circumstances under which the provision "to advance funds weekly to cover payroll, crane rental, and other charges" in the contract between American and Precision came into being was

that Precision advised American that it was not in a financial position to wait for monthly payments but would need payments at more frequent intervals. It was then agreed that American would advance weekly enough funds to cover Precision's payroll and crane rental and then would pay the difference, if any, owed to Precision at the end of each month.

10. Precision began work on Monday, November 11, 1968. However, the material failed to arrive until 7 or 8 days later.

11. Precision encountered numerous problems in erecting the materials as they arrived, such as holes which were not properly aligned and beams which were the wrong size.

12. Materials arrived haphazardly so that some items needed to begin construction arrived after some items which were to be used to finish the project.

13. The actual erection process could not be commenced until three weeks after the scheduled date of November 11, 1968.

14. The delays complained of by American were due at least in part to these various problems with the materials which American was responsible for manufacturing and delivering.

15. Despite the fact that no materials were available at the site on November 11, 1968, at the request and with approval of American, the men and equipment were kept on the job, and this became a back charge to a certain extent.

16. Precision first submitted a bill for charges on November 12, 1968 for work not included within the contract. The amount of the bill was $1,643.37 and it was paid by American by check dated the following day, November 13, 1968.

17. Precision then submitted the following bills, all of which were paid:

| DATE | AMOUNT | PERIOD COVERED WEEK BEGINNING | DATE OF AMERICAN'S DRAFT |
|---|---|---|---|
| 11–20–68 | $ 2,225.60 | 11–10–68 | 11–20–68 |
| 11–24–68 | 3,137.20 | 11–17–68 | 11–26–68 |
| 12–3–68 | 1,826.00 | 11–24–68 | 12–6–68 |
| 12–10–68 | 2,418.00 | 12–1–68 | 12–13–68 |
| 12–18–68 | 1,149.89 | 12–8–68 | 12–23–68 |
| 12–26–68 | 1,313.24 | 12–15–68 | 1–3–69 |
| 1–1–69 | 1,582.56 | 12–22–68 | 1–7–69 |
| 1–8–69 | 2,424.13 | 12–29–68 | 1–13–69 |
| 1–17–69 | 2,761.45 | 1–5–69 | 1–23–69 |
| 1–22–69 | 2,956.02 | 1–12–69 | 1–30–69 |
| | $21,794.09 | | |

18. The following bills were submitted by Precision but were not paid:

ITEMS NOT PAID:

| | | |
|---|---|---|
| 1–29–69 | $ 5,577.92 | 1–28–69 |
| 2–18–69 | 1,708.75 | |
| 2–13–69 | 5,362.55 | 2–11–69 |
| 2–5–69 | 4,769.66 | 2–5–69 |
| | $17,418.88 | |

19. The total billing for which payment was made was $23,467.26, which included $21,526.78 in work covered by the contract and $1,940.48 for extras.

20. In the latter part of January, 1969, American was advised by Berkeley that Berkeley was unsatisfied with the rate of progress of erection and that American should take measures to accelerate the rate of progress.

21. In the last week of January 1969, Lee, the Vice President and General Manager of American, met with Pizzutillo, the principal stockholder in Precision, in Philadelphia and advised him that Berkeley was requesting that Precision put more men on the job and accelerate its progress of the work.

22. According to Lee, American's foreman reported to him that in spite of

the earlier conversation between Lee and Pizzutillo, Precision still had not increased the number of men on the job.

23. About the beginning of February, 1969, Pizzutillo called Lee asking for money. Lee refused to pay more because he was under the impression that the amount of payments exceeded the rate of completion of erection.

24. Precision was unable to continue meeting its weekly payroll which American had agreed to pay under the contract, and, therefore, was unable to meet American's request that the erection be accelerated.

25. On or about February 10, 1969, Pizzutillo telephoned Lee in Texas and advised him that Precision had pulled off the job and would not return to work unless Precision received more money. Lee told Pizzutillo to return to work, that he, Lee, would come to Philadelphia, bring a check, and examine the progress of the work.

26. Precision returned to work on February 11 or 12, and on February 12 Lee came to the project from Texas bringing a check for $11,000, with the intention of paying Precision for its bills rendered for January 29, 1969 and February 5, 1969, which total approximated $11,000, if the progress on the job warranted such payment.

27. On his arrival in Philadelphia, Lee checked with Berkeley and the City representatives to determine the extent of completion, and it was his opinion that Precision had not made any improvement in erection progress.

28. On February 12, 1969, Pizzutillo advised Lee that unless he received additional funds he would depart the job. On that date Precision stopped its work and departed the project. At the time of Precision's departure from the project, the work to be done under its contract was not completed.

29. On the same date, American made arrangements with the Union to have the men return to work several days later. In order to persuade the Union to permit the men to return to work, American had to pay to the men directly an amount totalling $3,700.

30. On February 14, 1969, American sent to Precision a telegram containing the following message:

"Re sub contract for erection of hangars, Philadelphia Pa.

"This will serve as notice of your failure to perform under the terms and conditions of the above contract. We have been informed that you have abandoned the job. Unless you immediately man the project and show satisfactory evidence of your intention to complete this contract in accordance with the terms thereof, we will proceed to relet the work in accordance with paragraph 4 of the general conditions. Letter to follow."

(Ex. D–15)

31. On February 19, 1969 American sent another telegram to Precision containing the following message:

"Ref. subcontract for erection of hangars, Philadelphia, Pa.

"Your failure to properly man the above job in accordance with the above subcontract and our notice to you of 2/11/69 indicates a material breach of our contract with you. We are now proceeding to complete this job for your account in accordance with the general conditions."

(Ex. D–16)

32. The records of the City of Philadelphia (D–50 to D–77) showing the progress of the work and disbursements made on the project, indicated only $17,100 was authorized for payment for erection of the hangars as of January 31, 1969. (Ex. D–51, D–52, D–53). However, these records also indicate that as of January 31, 1969, 76.4809% of the entire job was completed. Since these records reflect the work performed as to the primary contract between the City of Philadelphia and Berkeley, they are not probative as to the percentage

completion as to the contract between American and Precision.

33. When Precision was forced to discontinue working, 50% of its contract obligation to American had been completed. At that time, 100% of the erection of steel was complete and 50% of the sheeting was upon the three hangars.

34. American was entitled under its contract with Precision to retain ten per cent. (10%) until completion of the work.

35. From February 14, 1969 to June 12, 1969, when the erection work was completed on the project, Exhibits D–17 and D–17a show that American incurred net expenses of $70,258.99 to complete the erection work. This, together with the amounts actually paid to Precision, namely $21,526.78 (excluding extras of $1,940.48) total $91,785.77 expended by American for the work contracted to Precision.

36. As it developed through the job, no bills were submitted for crane rentals after the first week, since, in fact, Precision owned its own crane and did not actually incur any crane rental charges.

37. The job was completed on June 12, 1969, 15 weeks after Precision was forced to discontinue working.

38. While Precision was on the job, it incurred the following expenses which were to be reimbursed by American in addition to the contract price:

$5,288.40—Crane time
7,912.45—Extras or back charges
1,708.75—Flashing

## DISCUSSION

The starting point in our inquiry is to decide whether American's delayed performance in providing materials and the defects in the materials provided constituted a breach of contract. The contract is quite specific in requiring that "materials will be delivered (by American) beginning about November 7, 1968, and erection work is to begin at that time." It might be argued that the possibility of delay in furnishing material was merely one of the calculated risks which constitute a normal feature of the contracting business. However, this view was explicitly rejected as a matter of Pennsylvania law [1] by our Court of Appeals in Johnson v. Fenestra, Inc. (Erection Division), 305 F.2d 179 (3rd Cir. 1962):

"The question here is whether the furnishing of defective panels and the ensuing delay in supplying serviceable panels constituted a breach of contractual obligation. The contract expressly required the prime contractor to supply the panels which the subcontractor had agreed to install. The contract also required that performance begin within 7 days after its execution. On July 14th, promptly after the arrival of the panels which later proved defective, the subcontractor put an adequate crew to work upon the installation. . . . We think the conclusion is inescapable that the bargain as made necessarily implied and gave the subcontractor assurance that the prime contractor would perform his obligation to supply panels at times and in quantities consistent with the understanding of the parties as to the prompt beginning and early completion of this installation. To rule otherwise would be to defeat the reasonable expectations created by the conduct of the parties."

■■ Since American's breach constituted a significant factor causing the delay in the erection of the hangars, it was clearly unreasonable for American

[1.] Because the contract was to be performed in Pennsylvania and had most of its other contacts with that state, Pennsylvania contract law determines whether the prime contractor's conduct in connection with the agreed supplying of materials constituted a compensable breach.

to take the position that no additional payments would be made until the project was brought up to date. American attempts to avoid this result by pointing to the fact that it had continued to pay bills for labor when in fact no work was performed because of the absence of materials. This, however, ignores the fact that because of its breach, American was *obligated* to pay the amount due under the contract in addition to any extra costs arising from the delay. Johnson v. Fenestra, Inc. (Erection Division), *supra*. Therefore, it would have been inevitable that at some point, the payments made to Precision would exceed the percentage of completion due to the delay in commencement of construction caused by American. Further, we have expressly made the factual determination that at the time Precision was forced to discontinue working on the project, 50% of the contract had been performed.

Moreover, this last finding, while being the only significant fact in dispute, is really not necessary to resolve the case in favor of Precision. Under the contract, American agreed to pay Precision's weekly payroll because it was known that Precision could not finance that amount. There is nothing in the contract which allows American to stop meeting the payroll costs if the work fell behind schedule, even if the delay was the fault of Precision. To construe the contract in this way would allow American to escape its contractual obligation as soon as the work fell behind, knowing that Precision did not have the resources to pay the labor costs to catch up. Naturally, the finding that American itself was responsible in large part for the delay makes this position even more untenable.

Judgment will be entered in the following amounts for plaintiff:

| | |
|---|---|
| $36,250.00 | 50% of contract price |
| 5,288.40 | Crane time |
| 7,972.45 | Extras or back charges |
| 1,708.75 | Flashing |
| $51,219.60 | |
| 23,467.26 | Credit for Monies Paid |
| $27,752.34 | |